UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TROY J. MACY,[1]                          )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )         Case No. 4:10-CV-1901 (CEJ)
                                          )
MICHAEL J. ASTRUE, Commissioner           )
of Social Security,                       )
                                          )
            Defendant.                    )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social

Security Administration.

## I. Procedural History

On November 7, 2002, plaintiff Troy J. Macy filed an application for supplemental

security income pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et

seq.* (Tr. 64-67). Plaintiff's application was denied on initial consideration (Tr. 32-36),

on reconsideration, (Tr. 42-44) and by an Administrative Law Judge (ALJ) (Tr. 536-42).

Plaintiff requested review by the Appeals Council, which remanded the case for a

supplemental hearing and new decision. (Tr. 547-49).[2] A supplemental hearing was

conducted on September 28, 2007. (Tr. 858-99). Plaintiff was accompanied by a non-

attorney representative and testimony was provided by a vocational expert. The ALJ

---

[1]The complaint is filed in the name of "Troy J. Macy." Plaintiff's name appears
on the application and medical records as "Troy J. Pressley." The parties have
provided no explanation for this discrepancy.

[2]The Appeals Council directed the ALJ on remand to obtain consultative
orthopedic and mental status examinations and medical source statements, reassess
plaintiff's Residual Physical Capacity, and obtain supplemental information from a
Vocational Expert. See Tr. 547-48 (setting forth specifics).

issued a decision denying plaintiff's claims on October 25, 2007, and the Appeals Council denied plaintiff's request for review on August 27, 2010. (Tr. 15-29; 6-8). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

Plaintiff filed a subsequent application for supplemental security income on December 30, 2010, with an alleged onset date of September 16, 2009. That application was granted by an ALJ on November 30, 2010. See Plaintiff's Brief, Ex. A. [Doc. #18-1].

## II. Evidence Before the ALJ

### A. Application and Related Documents

In the application completed on November 7, 2002, plaintiff listed his disabling conditions as "mental depression – bipolar," and "spinal disorder – pinched vertebrae." (Tr. 65-66). Elsewhere, he stated that he had constant aching and stabbing pain in his lower back. (Tr. 98). In his Disability Report (Tr. 73-82), plaintiff stated that his conditions kept him from working because he could not lift anything heavy or sit or stand for long periods of time. In addition, he felt depressed and could not be around people. His medications included Lorcet, Xanax, Zanaflex, Zyprexa, and Zocor. (Tr. 79). Plaintiff's documented earnings history begins in 1987 (the year he turned 17) and ends in 2001. He had no qualifying earnings for five of the intervening years and in no year did he earn as much as $3,500. (Tr. 68). He worked as a truck driver, welder helper, assembler, and "flyer," which he described as a job stacking newspapers into bundles. (Tr. 75, 93). His longest held position was as a security guard between 1990 and 1993.

Plaintiff completed Daily Activity Questionnaires (Tr. 108-09, 104-07) in which he stated that his physical problems caused him pain when lifting, standing, walking, or dressing. He had difficulties with sitting, using his hands, bending, kneeling, climbing, reaching, driving, reading, watching television, using the phone, or doing housework or yard work. He denied engaging in recreational activities. His psychiatric conditions caused anxiety attacks. He feared going outside and sleeping. He wanted to be left alone and wrote that he stayed home and hid in the bathtub. He made impulsive decisions. He had trouble remembering the things he needed to get done. He responded to criticism with hostility.

In a Reconsideration Disability Report completed on July 15, 2003, plaintiff indicated that his pain level increased every day due to bone spurs and joint problems. He wrote that he had hip replacement surgery in 1975; a second surgery was done in 1979 to remove a plate from the hip. In 1989, his "heart nerves" were damaged by arsenic poisoning. His mental disorders included bipolar disorder and oppositional defiant disorder, and he had paranoid delusions. (Tr. 117-22).

## B. Hearing on July 21, 2005[3]

Plaintiff was 35 years old. He attended school through the tenth grade and earned a GED. He lived with his wife, who had bipolar and multiple personality disorders and received disability. (Tr. 839). His four children did not live with him; two days before the hearing he consented to the termination of his parental rights to three of his children. (Tr. 832, 849).

---

[3]Tr. 814-57. Plaintiff resided in Texas at the time of this hearing, which was held in Victoria, Texas.

Plaintiff testified that he last worked in 2000 when he briefly drove a truck. He was not permitted to take his medications while he was a driver and he found the physical demands of the job too taxing. In addition, he became argumentative when off his antipsychotic medication. All of his jobs had been short-term due to his inability to get along with superiors. His prior jobs included welder's helper, security guard, short-order cook, factory work, carnival worker, and fast-food service.

Plaintiff was using crutches on the day of the hearing. He testified that in February 2005 his left leg gave out and he fell on his knee and chipped his hip socket. He was placed on bed rest for three months; he then used a wheelchair for a period of time and progressed to crutches. (Tr. 823). He had been wearing a brace on his right leg for about a year since his fall. He was diagnosed with prepatellar bursitis. (Tr. 826).

Plaintiff testified that he had Legg-Calvé-Perthes[4] disease as a child and underwent two surgical procedures to repair his left hip. (Tr. 823-24). As an adult, he experienced pain in his lower and middle back, left hip, right knee, right shoulder, and neck. (Tr. 824). He had received four spinal injections. (Tr. 824). In addition to his physical problems, plaintiff had experienced emotional problems his whole life. (Tr. 828). In his early twenties, he was hospitalized after he expressed suicidal thoughts. (Tr. 830). He testified at the hearing that he thought about suicide every day. He had auditory hallucinations "all the time." He heard mumblings and voices calling his name. He described visual hallucinations as well, stating that he saw spiders, rats and people that weren't there. He had insomnia which he attributed to a fear of dying. He

---

[4]Legg-Calvé-Perthes is an idiopathic aseptic necrosis of the femoral head, typically occurring in boys aged 5 to 10 years old. See Merck Manual of Diagnosis and Therapy 2915 (19th ed. 2011).

sometimes did not sleep for two or three days at a time. He testified that he did not like people and became nervous when he left the house. He testified that he no longer drove, citing worries about what might happen. (Tr. 833). He had problems with "exploding," and as a consequence was arrested multiple times when younger for conflict with the police or destruction of property.

Plaintiff had difficulty concentrating but managed his finances. He occupied his time with reading, watching movies, playing on the computer, and talking to the cat. He testified that he bathed himself but occasionally required some help with dressing. He and his wife relied on church members to take them grocery shopping.

Plaintiff acknowledged that between the ages of 13 and 19 he used illegal drugs, primarily marijuana and LSD. (Tr. 822). He quit when he "hurt [his] heart." In 1995 and 1996, he used alcohol to excess because he was in a lot of pain and not receiving medical care. He quit drinking in 2001. At the time of the hearing, he was required to submit to random drug screens as a condition for receiving prescriptions for the pain killers MS Contin and Avinza.

## C. Hearing on September 28, 2007[5]

Plaintiff testified that he lived with his fiancee in what he described as a facility for elderly and disabled people in Rolla, Missouri. Plaintiff had no income and received Medicaid and food stamps. The residential facility provided him one meal a day. A case manager from Pathways Community Services took him out once a week to public places as part of his treatment plan.

---

[5]Tr. 858-99. This hearing was held in Columbia, Missouri. Much of plaintiff's testimony at this second hearing is necessarily repetitive and the Court will address only those statements that provide new information or appear to contradict or clarify his earlier testimony.

Plaintiff testified that he was fired from his last job as a truck driver because he did not get along with others.  In addition, he "doubled up" on his pain medication because driving caused him a lot of pain.  The morphine he was taking caused him to fail drug screens.  He did not believe he could maintain sufficient alertness to perform work-related tasks throughout the day.

Plaintiff testified that he was being treated for schizophrenia, schizoaffective disorder, oppositional-defiant disorder, and manic depressive disorder.  His mental conditions had worsened in the two years since his last hearing, and he had more hallucinations and was more argumentative and antisocial.  His physical conditions included degenerative bone disease in his neck, spine, and pelvis; a rotator cuff injury that healed poorly; pain in his right knee; numbness in his left leg; and a stabbing pain in his ribs.  He testified that his childhood surgeries left him with screws in his left hip that caused a lot of pain in cold or damp weather.  He broke both wrists as a child. Breathing caused him to feel a stabbing pain that he likened to a cracked rib.  He was told that he had a pinched nerve in his neck.  He experienced numbness in his arms, especially his left arm.  He was able to bend and stoop, although it caused pain. Climbing stairs caused pain in his knees.  He slept no more than five hours a day and had little energy.  He spent his time reading novels, listening to music, and playing on his computer; he did not watch much television.  On cold or rainy days, he experienced trouble with bursitis and needed some help with dressing.  He had not received physical therapy because payment for the services was not covered by Medicaid.  He intended to have surgery to address the pinched nerve in his neck once he received disability.

John McGowan, Ed.D., a vocational expert, provided testimony regarding employment opportunities. In response to the first hypothetical posed by the ALJ, Dr. McGowan opined that an individual experiencing the levels of pain and discomfort as alleged by plaintiff would be unable to sustain any work activity. Dr. McGowan was next asked about the employment opportunities for an individual who had no significant cognitive dysfunction but was moderately limited in his ability to interact appropriately with the public, supervisors, or co-workers, and in his ability to respond appropriately to usual work situations and to changes in a routine work setting.[6] The expert was further asked to assume that the individual had chronic neck strain, a history of surgery of the left hip, and a history of injuries to the right shoulder and the right knee with some persisting symptoms.[7] He opined that such an individual could return to plaintiff's past relevant work as an assistant welder. Dr. McGowan was next asked to assume the individual had moderate limitations in the ability to understand, remember, and carry out detailed instructions; the ability to maintain concentration and attention for extended periods; and the ability to complete a normal work schedule without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.[8] He testified that these limitations did not alter his opinion of such an individual's ability to work; he noted, however, that employers do not retain individuals who cannot perform

---

[6]These limitations reflect those specified by Thomas J. Spencer, Psy.D., who completed a consultative evaluation of plaintiff on July 6, 2007. (Tr. 806-14).

[7]These limitations reflect those specified by Jack C. Tippett, M.D., who completed a consultative examination of plaintiff on June 26, 2007. (Tr. 798-805).

[8]These limitations reflect those specified by Mehdi Sharifian, M.D., who completed a Residual Functional Capacity Assessment – Mental on June 2, 2003. (Tr. 524-26).

at a consistent pace without unscheduled rest periods. Finally, Dr. McGowan was asked to consider an individual who can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand or walk, intermittently, for 2 hours out of 8; can walk for 5-8 minutes at a time; can sit for 30-40 minutes at a time; cannot climb ropes, ladders, and scaffolds; cannot perform work that requires balance; and who must avoid concentrated exposure to cold temperatures, walking on wet surfaces and extreme vibrations. He opined that such restrictions would preclude employment.

### III. Medical Evidence

#### A. Plaintiff's Physical Ailments

The administrative record contains treatment notes from Texas (from October 1998 through October 2003) and Missouri (November 2005 through July 2007). The records for the time during which plaintiff fractured his left hip are missing, although they were apparently included in the record submitted to the ALJ who conducted the first hearing. See Decision dated December 23, 2005. (Tr. 536-42) (referring to records submitted by treating physicians Timothy McFarland and Elias Benhamou).

While he lived in Texas, plaintiff received his primary medical care at the Coastal Medical Center from Gary Cook, P.A., with additional care from the Gulf Bend Center, Mid-Coast Family Services, the Memorial Medical Center, and the Wood Care Center of Victoria. He also received mental health services from Joe McCracken, M.Ed. Plaintiff was a frequent utilizer of medical services – for example, the records reflect that he had more than 30 service contacts in 2001, and more than 20 in 2002. He maintained similar patterns of usage once he moved to Missouri. Throughout his treatment, he received prescriptions for a number of medications, including Xanax,

Zyprexa, Lorcet, Zocor, Soma, Demerol, Vistaril, Lithium, and Celebrex. He also received trigger point injections for pain.

In January 2001, plaintiff sought emergency care for suicidal thoughts and assistance to quit drinking. He also reported significant pain due to pinched nerves in his back or neck. (194, 181). On January 29, 2001, plaintiff went to the emergency room after ingesting 10 Xanax pills and drinking beer. (Tr. 247, 186-88). Plaintiff's mood and affect were assessed as "normal" and he was without suicidal ideation; he was discharged after treatment with charcoal ingestion. On February 21, 2001, Gary Cook noted that plaintiff had a past history of inpatient treatment for bipolar disorder, paranoia, and social phobias. Plaintiff was given a refill of Xanax and was started on Zoloft. (Tr. 159). At follow-up one month later, it was observed that the Zoloft increased plaintiff's anxiety, so it was discontinued and plaintiff was prescribed Lithium. (Tr. 272). In April 2001, plaintiff was assessed, and rejected, for admission to a mental health treatment program operated by the Gulf Bend Center. (Tr. 156, 248, 408). Nonetheless, throughout May, June and July 2001, he reported to Gary Cook that he was doing well. (Tr. 398-408). He received a trigger point injection in May.

Plaintiff was assessed for mental health services at the Gulf Bend Center in April and May 2001. (Tr. 249-55). It was determined that he did not qualify for services because no clear evidence of mental illness was disclosed during the assessment or in plaintiff's medical history. (Tr. 205)

Plaintiff reported that he had a bicycle accident in August 2001. (Tr. 396). X-rays of the right arm and shoulder disclosed no fracture, dislocation or tendonitis. (Tr. 260-62). Plaintiff had an MRI of the cervical spine in November 2001. (Tr. 259). The

MRI, described as being of poor quality, revealed disc osteophytic changes on the left side at level of C5-C6, causing mild to moderate left foraminal stenosis.

By mid-November 2001, plaintiff was apparently experiencing mania – he had lost his medication while fishing and was unable to sleep. He was described by his wife and mother as agitated, paranoid, and hearing voices. (Tr. 378, 246, 137). His wife reported that he had not slept for four days. (Tr. 139). Boniface Gbalazeh, M.D., completed a psychiatry assessment and found plaintiff to be irritable, of average intelligence, with coherent thought and without delusions. He was discharged without further treatment. (Tr. 246). When Mr. Cook saw plaintiff on November 20, 2001, he noted that plaintiff was calm but still paranoid. He gave plaintiff samples of Zyprexa. Six days later, plaintiff requested a refill of Xanax. (Tr. 375).

An MRI of plaintiff's lumbar spine was completed on December 18, 2001. (Tr. 258). It disclosed no evidence of disc protrusion or herniation and no foraminal stenosis or central canal stenosis. In January 2002, Mr. Cook reviewed the MRI results with plaintiff. (Tr. 369). On examination, plaintiff had a limited range of motion of the back and some tenderness; straight-leg raising was negative and no motor or sensory deficits were noted. Plaintiff was referred to a pain clinic.

In early February 2002, plaintiff reported abdominal pain and insomnia. (Tr. 480). A radiologic study of the abdomen was unremarkable. (Tr. 287). In May 2002, plaintiff reported experiencing back pain that radiated to his knees. On examination, plaintiff displayed swelling, tenderness, and a limited range of motion; straight-leg raising was positive; an x-ray of the lumbar spine was unremarkable. (Tr. 351-52, 201). In June and July 2002, plaintiff reported that he was experiencing headaches and migraines and felt like his head was "exploding." Mr. Cook described him as

"excited" and "irritable" and unable to stop moving. (Tr. 347, 343-44). In August and September, 2002, plaintiff received treatment for what was described as a "knot" on his neck. His neck was tender and his range of motion was limited. He also had tenderness in his low back. (Tr. 339-40). A CT scan of the neck disclosed no abnormalities. (Tr. 286). Plaintiff also experienced elevated anxiety during this period. (Tr. 335-36).

On November 14, 2002, Mr. Cook provided a statement in which he opined that he believed that plaintiff's "current medical and physical condition prevents him f[rom] holding a stable job. He mentally has a tough time with authority. Physically, with work conditioning, he could probably do some type of mildly physical work." (Tr. 315).

Plaintiff began twice-monthly counseling with Joe McCracken, M.Ed., in January 2003. Plaintiff was noted to make "great" eye contact but with paranoid thought content. He was irritable, angry, depressed, worried, and sad; he was also alert, attentive, and oriented, but slow in thought, rigid, and distorted. Mr. McCracken's initial diagnoses were major depression with psychosis, rule out paranoid delusional disorder, rule out paranoid schizophrenia. He assigned plaintiff a GAF score of 40.[9] (Tr. 499-S). Over the course of treatment, Mr. McCracken noted that plaintiff's condition was improved by medication, but he continued to display poor judgment and little insight. Plaintiff was routinely observed to be cooperative and engaged but simultaneously angry, irritable, and sad or depressed. He frequently reported visual

_____

[9]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

hallucinations. On August 6, 2003, plaintiff reported that he had smoked marijuana on his way to the session and he was described as "stoned." (Tr. 500R).

On January 27, 2003, plaintiff met with Johnnie G. Fisher, M.D., for a consultative psychiatric evaluation. (Tr. 401-04). Plaintiff's symptoms included dysphoria, hopelessness, thoughts of suicide, decreased self-esteem, initial insomnia, decreased appetite and libido, and variable energy. He reported having visual and auditory hallucinations. Dr. Fisher described plaintiff as an adequate historian who offered spontaneous elaboration on points of history. Dr. Fisher opined that plaintiff probably functioned in the low normal to normal range of intelligence, which was "a little higher than would be expected by his educational history." He had the ability to learn new information and follow instructions. In addition, Dr. Fisher found that plaintiff had fairly good social skills. Plaintiff did not have good insight into his difficulties and his social judgment was impaired. Dr. Fisher's diagnoses included possible (though not probable) schizoaffective disorder, polysubstance abuse, apparently in remission, and personality disorder, not otherwise specified. Dr. Fisher assigned a GAF score of 50 and assessed plaintiff's prognosis as "somewhat guarded" as many of plaintiff's difficulties were characterologic. However, "[a]ny disability would have to be based on his physical difficulties."

Plaintiff had an MRI of his left hip on March 3, 2003, to assess complaints of pain. (Tr. 508). The hip joints and sacroiliac joints appeared symmetrical and there was no evidence of significant joint effusion, cartilage defect, or edema. The MRI was pronounced "normal." There is no mention of the hardware that plaintiff testified remained in his left hip following childhood surgery.

-12-

Joseph M. Long, M.D., completed a consultative internal medicine evaluation on March 7, 2003. (Tr. 500B-E). Plaintiff reported that he suffered from fatigue, headaches, decreased hearing, chest pain, palpitations, ankle edema, nausea and vomiting, back and joint pain, muscle spasm and numbness. He denied experiencing headaches, seizures, and joint swelling. On examination, Dr. Long did not detect any palpable masses in plaintiff's neck. Plaintiff did not appear to be in any pain, showed no atrophy in the extremities, and had a normal gait. The neurologic examination was unremarkable. Dr. Long opined that plaintiff's ability to do work activities such as sit, stand, move about, lift, and carry were not "too greatly compromised even though he denies he cannot [sic] do it. . . [and] I see no evidence on physical exam that indicates he cannot." (Tr. 500-E). Active and passive ranges of motion of the joints were all full; there was no evidence of muscle spasms in the back, no atrophy of any muscles, and no reflex changes. He had normal strength and coordination of his hands and there was no evidence of any disorganization of motor function in the extremities. Plaintiff's gait and station were normal, but he appeared to lose his balance when completing heel- and toe-walk, squat, hop, and tandem-walking, although Dr. Long suspected plaintiff of faking during this aspect of the examination.

On March 11, 2003, plaintiff went to Coastal Medical Clinic with upper respiratory complaints. (Tr. 502-03). He asked the examiner, who was not Mr. Cook, whether he could receive a 75 milligram shot of Demerol. When he was told no, he wadded up his prescriptions and walked out. At various times until August 2003, plaintiff sought treatment at Coastal Medical Clinic for pain and headache. For the most part, the clinical findings were unremarkable; however, on June 9, 2003, Mr. Cook noted that

plaintiff had limited range of motion of the back.  (Tr. 509R-S).  On July 8, 2003, plaintiff reported that he fell because his legs became numb.  (Tr. 509L).

There is a gap in the medical records from August 2003 until November 2005, when plaintiff presented to the Phelps County Regional Medical Center emergency room in Rolla, Missouri, requesting admission for opiate detoxification.  (Tr. 650-52).  He reported that he had recently moved from Texas to Missouri, where he had expected to qualify for benefits.  However, he had not received benefits and could not afford the Xanax and MS Contin he had previously taken.  He reported that he also took Risperdal to control hallucinations.  He was admitted for a three-day detoxification program.  He left the following day against medical advice.   (Tr. 649).

On November 22, 2005, Kevin W. Brewer, D.O., completed a general medical examination of plaintiff for the Missouri Division of Family Services.  (Tr. 605-08).  Plaintiff told Dr. Brewer that pain interfered with his ability to sit, stand, walk or find a comfortable position, and kept him sleeping more than 2 or 3 hours a night.  He stated that he had been treated with high doses of narcotics but was not presently taking any.  On examination, Dr. Brewer noted that plaintiff's neck was supple, his deep tendon reflexes were symmetrical, his grip was equal, and his cranial nerves were intact.

The record contains two pages of a December 14, 2005, clinical psychological evaluation by an unnamed examiner at Pathways Behavioral Health, Inc., completed at the request of the Phelps County Family Support Division.  (Tr. 619-20).  Plaintiff reported that he arose between 6:00 and 8:00 in the morning.  He lay on the couch and read, while waiting for his pain to subside.  He walked to complete his errands, but this caused him so much pain that he had to go to bed when he returned home.  He

-14-

tried to help with chores and cooked easy meals with his wife. He played Dungeons and Dragons until he could not sit any longer. The examiner described plaintiff as disheveled. His facial expressions were void and he maintained poor eye contact. He was "somewhat cooperative," but appeared suspicious and was in an irritable and hostile mood. His speech was clear, logical, and coherent. The quality of his thinking was described as adequate. Memory functions were somewhat impaired. He answered 5 out of 6 "social judgment" questions correctly and appeared to be functioning in the average range of intelligence. "Math functions were intact [but] he had difficulty in calculation as his concentration was blocked by auditory hallucinations." The examiner concluded that plaintiff did not seem "capable of tolerating normal external stress and vocational pressures."

On February 16, 2006, plaintiff began seeing David R. Buvat, M.D. (Tr. 705-06). He reported severe, chronic back pain, which he rated at 10 on a 10-point scale; MS Contin reduced the pain to level 4 but wore off within 6 hours, after which he took Lortab. The physical examination was unremarkable. Plaintiff signed a pain contract and was prescribed MS Contin, Xanax, Seroquel, Soma, and Lorcet. One month later, on March 16, 2006, plaintiff told Dr. Buvat he was "doing okay" and his prescriptions were refilled. (Tr. 703). The next day, plaintiff was transported to the emergency room by an ambulance. He reported that he had reached for something and felt pain in his chest. He told the ambulance crew he thought he had broken a rib and told the emergency room examiner that he had shoulder pain. The examiner indicated that plaintiff was not in acute distress and he had normal range of motion of the shoulder. (Tr. 781). X-rays of plaintiff's shoulder and clavicles were unremarkable. (Tr. 794-

95). On April 13, 2006, Dr. Buvat again concluded that plaintiff was doing "relatively well" on his medications. (Tr. 702).

In May 2006, plaintiff reported to Dr. Buvat that he had pain in his right shoulder, which he ascribed to a flare-up of bursitis. He requested an injection. (Tr. 701). Dr. Buvat detected some tenderness on examination, but no evidence of rotator cuff tear or muscle atrophy. On June 2, 2006, Eric Willoughby, M.S., C.N.P., completed an orthopedic consultation. (Tr. 699-700). Plaintiff reported that he had pain in his shoulder with overhead lifting and internal rotation. He also stated that he had previously been told that he had a rotator cuff tear and tendinitis. On examination, plaintiff was not in acute distress and no instability of the shoulder was noted. He had good sensation and good grip strength. Impingement testing of the right shoulder was positive. X-rays showed no fracture, dislocation, subluxation, or significant degenerative changes. Plaintiff was given an injection of a mixture of Marcaine, Depo-Medrol, and Kenalog. When plaintiff saw Dr. Buvat on June 14, 2006, he reported improvement in the shoulder pain. (Tr. 698).

Plaintiff had a follow-up orthopedic evaluation on July 13, 2006 by Steven C. Weissfeld, M.D. (Tr. 695-96). At that time, plaintiff reported that he had received only "fleeting" relief from the injection. Ranges of motion were unchanged. Plaintiff had moderately severe subacromial impingement and "give-way weakness."[10] An MRI obtained on August 9, 2006, showed some thickening of the tendons consistent with tendinopathy and a very small nidus of calcific tendinitis. (Tr. 693). On August 17,

---

[10]"Malingering and other functional weakness is often characterized by give-way weakness, in which normal strength of effort suddenly gives way." Merck Manual of Diagnosis and Therapy 1602 (19th ed. 2011).

2006, plaintiff was told that it was too soon for him to receive another shoulder injection. (Tr. 690).

On August 19, 2006, plaintiff called for an ambulance after he fell. (Tr. 767). He was transported to the emergency room, where he was evaluated for pain in his right shoulder and right knee. (Tr. 764). On examination, he was found to have an abrasion on his right knee. Otherwise, he had full range of motion of the shoulder. An x-ray of the shoulder disclosed no fracture and was essentially unchanged from the x-ray taken on March 17, 2006. (Tr. 634). He was discharged with a sling. (Tr. 778).

On August 23, 2006, plaintiff complained of bilateral pain in his hips, for which he received injections in each hip. (Tr. 689). On October 23, 2006, he received another injection in his right shoulder, although the physical examination was unremarkable. (Tr. 686).

Chest x-rays were taken on November 11, 2006, after plaintiff went to the emergency room with complaints of chest pain after he felt a pop in his chest. (Tr. 733, 630). He was diagnosed with bronchitis. Plaintiff returned to the emergency room on December 7, 2006, with complaints of pain in his right shoulder after he fell. (Tr. 719-32). An MRI showed no fracture. He was discharged with a sling and was told to apply ice to painful areas and take Naprosyn. An MRI of the lumbar and cervical spine completed on December 12, 2006, was unremarkable. (Tr. 664-65).

Plaintiff began treatment at Pathways CBH in late 2006. (Tr. 674-80). The record contains reports of two medication reviews conducted by Fauzia Iqbal, M.D., in January and February 2007. Plaintiff was prescribed Lamictal in January to address mood stabilization, but he discontinued it on his own. He reported that the dosage of

Risperdal he was taking made him feel like a zombie, and Dr. Iqbal reduced the dosage. (Tr. 671-72).

Jack C. Tippett, M.D., completed a consultative orthopedic evaluation on June 26, 2007. (Tr. 798-805). On examination, plaintiff walked without a definite limp, was able to stand on his toes and on his heels, assume a full squatting position and rise to standing again while holding onto the table with one hand, touch the floor with straight knees, and get on and off the examination table without assistance. With respect to ranges of motion, Dr. Tippett noted only a slight limitation of the right shoulder with abduction and minimal decrease in lateral flexion of the neck. His reflexes were symmetrical and normal, he had good grip strength and finger motion. He had good motion and stability in both hips. The clinical impression was multiple complaints of various areas of the back, chronic neck strain, history of surgery of the left hip, and history of injuries to the right shoulder and right knee with some persisting symptoms. Dr. Tippett found that plaintiff had no physical impairment.

Thomas J. Spencer, Psy.D., completed a psychological evaluation in June and July 2007. (Tr. 806-14). In his review of the records, Dr. Spencer noted that Dr. Iqbal reported on one occasion that plaintiff did not appear to respond to internal stimuli even though he complained of persistent auditory hallucinations. Furthermore, although plaintiff was previously diagnosed with schizoaffective disorder, he was never described as overtly psychotic. In the course of the evaluation, plaintiff did not appear to be in any physical distress and maintained fair eye contact, although his speech was flat. He did not appear to be responding to internal stimuli and did not appear overly suspicious, hypervigilant or paranoid. Dr. Spencer noted that plaintiff's insight and

judgment were poor. On the WAIS-III,[11] plaintiff received a Full Scale IQ of 84, which placed him in the low-average range of intellectual functioning. The MMPI-2[12] was invalidated as a result of plaintiff's over-endorsement of symptoms of a pathological nature. Plaintiff's score on the M-FAST[13] suggested that he might have been malingering mental illness. Dr. Spencer assessed that plaintiff had mild impairments of his abilities to make judgments on simple and complex work-related decisions; understand and remember complex instructions; and moderate impairment of the abilities to interact appropriately with public, supervisors, co-workers; or respond appropriately to usual work situations and to changes in a routine work setting.

## IV. The ALJ's Decision

In the decision issued on October 25, 2007, the ALJ made the following findings:

1.    Plaintiff has not engaged in substantial gainful activity since November 15, 2002, the alleged date of onset.

2.    Plaintiff has the following medically-determinable impairments: neck strain, right shoulder strain, right knee strain, back strain, polysubstance dependence, and a personality disorder.

3.    Plaintiff does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, plaintiff does not have a severe impairment or combination of impairments.

4.    Plaintiff has not been under a disability, as defined in the Social Security Act, since November 15, 2002.

(Tr. 18-29).

## V. Discussion

---

[11]Weschler Adult Intelligence Scale-III.

[12]Minnesota Multiphasic Personality Inventory-2.

[13]Miller Forensic Assessment of Symptoms Test.

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of

performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

In this case, the ALJ determined at Step 2 that plaintiff does not have a severe impairment and thus is not disabled.

## A.    Standard of Review

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

## B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ improperly (1) failed to find that plaintiff suffered from severe mental and physical impairments; (2) failed to consider the combined effects of plaintiff's impairments in considering whether his impairments equaled a listing; (3) failed to give "great weight" to the opinions of plaintiff's treating physicians; and (4) failed to recontact plaintiff's medical providers.

### 1.    The ALJ's Step 2 Determination

Step 2 of the five-step evaluation provides that a claimant is not disabled if his impairments are not "severe," and have lasted or are expected to last for at least 12 months. 20 C.F.R. § 416.920(a)(4)(ii); § 416.909 (duration requirement). An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)). It is the claimant's burden to establish that his impairment or combination of impairments are severe. Id. "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. Id. at 708 (citations omitted).

The ALJ's determination that plaintiff does not have a severe physical impairment is supported by evidence in the record as a whole. Objective medical tests routinely failed to disclose underlying conditions consistent with plaintiff's allegations of pain. Plaintiff had x-rays or MRIs of his right shoulder on at least four occasions between 2001 and 2006. Each study was negative for dislocation or fracture and showed no evidence of rotator cuff tear. Upon occasion, it was determined that plaintiff had tendonitis but there is no indication that this condition could be expected to impair plaintiff's ability to work for 12 months. Similarly, repeated studies of plaintiff's spine showed, at most, mild to moderate stenosis of the cervical spine in November 2001; a subsequent MRI of the cervical spine in December 2006 was unremarkable. Studies of the lumbar spine were routinely negative. Similarly, plaintiff's left hip, which he testified was surgically reconstructed when he was a child and caused him pain as an adult, was extensively examined and no abnormalities were disclosed.

In addition to the radiologic studies, the record contains the reports of multiple physical examinations.  Mr. Cook occasionally observed swelling in plaintiff's back and some restriction in range of motion.  However, on only one occasion did Mr. Cook indicate that straight-leg raising was positive; he never indicated that plaintiff had an abnormal gait.  More importantly, in November 2002, Mr. Cook opined that plaintiff could do "mildly physical work" with work conditioning.  Dr. Weissfeld, who provided orthopedic treatment to plaintiff in 2006, noted that plaintiff had "give-way" weakness on motor testing of the shoulder.  Such weakness can be an indication of malingering. Plaintiff had consultative examinations in March 2003 and June 2007.  In both examinations, plaintiff displayed normal gait, normal grip strength, and good ranges of motion.  There was no indication of atrophy, muscle spasm, or motor or sensory deficits.  Both examiners received the impression that plaintiff's difficulty with balance while performing motor tests (such as heel-toe walk and squatting) was not genuine.

Plaintiff also claims that he has disabling psychological impairments, including schizoaffective disorder and bipolar disorder.  Mr. Cook opined that plaintiff was disabled by virtue of his mental issues.  There is no contention, however, that Mr. Cook has expertise in psychology or psychiatric medicine and his treatment notes do not indicate that he ever conducted an assessment of plaintiff's psychological condition beyond a basic mental status examination.  Mr. McCracken, who did provide counseling services to plaintiff, never opined that plaintiff was unable to work.  Mr. McCracken routinely described plaintiff as engaged and cooperative.  In 2003, consultative examiner Dr. Johnnie Fisher similarly described plaintiff as cooperative and responsive, with clear speech and logical thought patterns.  Only one examiner ever noted that plaintiff was responding to internal stimuli -- despite his repeated reports that he had

-23-

constant hallucinations -- and that notation appears in an incomplete and unsigned evaluation from which no conclusions can be drawn.

The record contains a number of formal assessments of plaintiff's mental health, only one of which yielded a diagnosis of schizoaffective disorder. On May 1, 2001, plaintiff was assessed for admission to Gulf Bend Center. (Tr. 169-78, 248-55). The evaluator assigned plaintiff the diagnoses of Adjustment Disorder with mixed anxiety and depression; polysubstance dependence; and antisocial personality disorder. On January 22, 2003, Mr. McCracken completed an initial assessment and assigned plaintiff the diagnoses of major depression with psychosis, rule out paranoid delusional disorder, and rule out paranoid schizophrenia. Mr. McCracken's subsequent treatment notes do not include an updated diagnostic assessment. In 2003, Dr. Fisher expressed scepticism regarding plaintiff's diagnosis of schizoaffective disorder. In December 2006, plaintiff was assessed for treatment at Pathways CBC and was assigned a diagnosis of schizoaffective disorder. (Tr. 673-80). The record does not contain an updated assessment from Pathways. Furthermore, there appear to be no cognitive barriers to employment: objective tests administered in 2007 established that plaintiff is of low average intelligence. Plaintiff's scores on personality inventories were invalid as a result of his over-endorsement of pathological symptoms; likewise, his performance on the M-Fast was indicative of malingering. The ALJ did not err in concluding that plaintiff's mental health impairments were not severe.

Plaintiff relies on the two other ALJ decisions to support his claim that his impairments were severe. The first decision, issued on December 23, 2005, determined that plaintiff had the severe impairments of bipolar disorder, personality

disorder, status-post hip surgery, and a disorder of the lumbar spine.[14]    (Tr. 536-42).
Thus, plaintiff argues, the ALJ erred on remand by finding that none of plaintiff's
impairments were severe.  However, plaintiff does not assert that the first decision was
binding on any subsequent reviewer.  Substantial evidence in the record supports the
ALJ's determination that plaintiff's impairments were not severe.

Yet another ALJ granted plaintiff's second application in 2010, finding that
plaintiff had the following severe impairments: degenerative joint disease of the spine,
subacromial impingement of the right shoulder, schizoaffective disorder, and
personality disorder with antisocial and borderline traits.  See Doc. #18-1.  The 2010
determination applied from September 16, 2009, onward and has little relevance for
establishing that plaintiff was disabled between March 1, 2000, and October 25, 2007,
as plaintiff contends here.

The ALJ's determination that plaintiff did not suffer from a severe impairment
is supported by substantial evidence in the record.

### 2.  Plaintiff's Impairments in Combination

Plaintiff argues that the ALJ erred in failing to find that plaintiff's conditions, in
combination, render him disabled.  He also challenges the ALJ's determination that his
allegations of disabling symptoms were not credible.

"In order to assess a claimant's subjective complaints, the ALJ must make a
credibility determination by considering the claimant's daily activities; duration,
frequency, and intensity of the pain; precipitating and aggravating factors; dosage,
effectiveness and side effects of medication; and functional restrictions."  Mouser v.

---

[14]Despite these impairments, the ALJ determined that plaintiff had the residual
functional capacity to perform work available in the national economy, such as circuit
assembler or cashier (booth type).

Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir.2002)). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

The ALJ specifically noted the findings by Dr. Long and Dr. Fisher that plaintiff was faking or malingering as evidence that detracted from his credibility. This evidence, when considered in conjunction with the absence of objective medical evidence of disabling impairments discussed above, supports the ALJ's credibility determination. As for plaintiff's argument that his impairments in combination preclude work, no treatment provider opined as such and his argument is without merit.

### 3. Opinion of Treatment Providers

Plaintiff argues that the ALJ should have given greater weight to the opinions of his treatment providers. However, no provider, other than Mr. Cook, ever opined that plaintiff was limited in his ability to perform work-related activities. Indeed, even Mr.

Cook believed that plaintiff was capable of mild physical work. This argument is rejected.

### 4. <u>Recontacting Treatment Providers</u>

Plaintiff argues that the ALJ was required to recontact his treatment providers. While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped, the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." <u>Martise v. Astrue</u>, 641 F.3d 909, 926-27 (8th Cir. 2011) (quotation, alteration, and citation omitted). Plaintiff does not specify what further information the ALJ should have sought. More importantly, the medical record before the ALJ provided sufficient information to make a determination whether plaintiff was disabled.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#18] is **denied**.

_Carol E. Jackson_
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 17th day of January, 2012.